## PADGETT *vs.* LAWRENCE and others.

The word junior forms no part of the name of the person to whose name it is usually affixed, but is merely descriptive of the person intended; and is usually adopted to designate the son where a father and son both have the same christian name as well as the family name.

Where two persons have the same name, and a deed is given to one of them omitting the word junior, it is only presumptive evidence that the eldest person of the name, and who will answer the description in the deed in other respects, was intended as the grantee; which presumption may be rebutted by showing that the grantor intended to convey to the youngest one, by the name and description in the deed.

As a general rule a purchaser of the legal title to property, who receives the conveyance thereof merely upon the consideration of a prior indebtedness of the grantor, is not entitled to protection as a bona fide purchaser of such property without notice of a prior equity of a third person therein. But the relinquishment of a valid security which the purchaser before held for his debt, and which cannot be revived so as to place him in the same situation substantially as to security as he was in prior to his purchase, may entitle him to such protection.

Declarations made by a person in possession of real estate, as to his interest or title to the same, may be given in evidence against those who have subsequently derived their title from or under him, in the same manner that such declaration could have been used against him if he had not parted with his possession or interest in the property.

But declarations of a former owner of property which were made after he had parted with his interest therein, or which declarations are overreached by the purchase of the party who claims through or under him, cannot be received as evidence to effect the legal or equitable title of such party to the premises.

Thus the declarations or admissions of an owner of land, made subsequent to the docketing of a judgment against him, are not admissible as evidence against a purchaser under such judgment, although they were made previous to the sale by the sheriff.

Declarations or admissions of third persons are not legal evidence to establish or to destroy a title to land, or to prove or disprove the existence of a trust in relation to such lands, except as against those who have derived title to the lands from the persons making such declarations or admissions, and by a title subsequent to the making thereof.

A trust resulting from the mere payment of the purchase money of land, previous to the revised statutes, was a resulting trust in favor of the person

paying such money; and descended to his heirs upon his death. But the payment of the money by one person will not raise a resulting trust by implication in favor of another.

1843.

Padgett
v.
Lawrence.
April 4.

THIS was an appeal from a decree of the vice chancellor of the sixth circuit. The object of the complainant's bill was to obtain a decree restraining the defendants, Lawrence & Keese, from proceeding in a suit at law to recover a lot of land in Chenango county called the Carson lot, and to quiet the complainant's title to the premises. The land in question originally belonged to P. Livingston, who, by his agent, J. Morris, in December, 1809, contracted to sell it to J. Walker for $400 ; forty dollars of the purchase money to be paid down, and the residue to be paid in six years with the interest thereon annually. And by the terms of the written contract, Walker was to have a conveyance of the premises, upon the payment of the balance of $360 and interest. A year or two after Walker took this contract he made a parol agreement with John Padgett, the father of the complaint, to let him have the land, upon his repaying the $40 which Walker paid when the contract was executed. Padgett was to take out a new contract in his own name, so as to discharge Walker from liability, and the contract of December, 1809, was given over to him to enable him to do so. Under this parol agreement, Padgett went into possession of the premises and made some improvements, and built a grist mill thereon in connection with Carson. The grist mill, however, was carried off by a flood soon after it was built, and there was then some difficulty between Padgett and Carson, in relation to the rights of the latter, who continued to occupy the house upon the premises for a short time thereafter. In January, 1816, Padgett delivered to the agent of Livingston a draft on England drawn by his mother in his favor for £112 sterling, to be applied on the contract. The proceeds of this draft were sufficient to pay the $360 and the simple interest thereon ; but leaving about thirty dollars due, upon a computation of interest upon the interest as it became due and payable, annually, by the terms of

the contract. On the 10th of May, 1824, the agent of Livingston took the note of the complainant's father for the balance then due, and endorsed it upon the contract, with a memorandum under such endorsement that when the note should be paid a deed would be delivered to John Padgett, or his assigns, for the land mentioned in the contract. The note was never paid, but a suit was afterwards brought thereon against the complainant's father, in favor of the executors of Livingston, and a judgment recovered for the amount, in June, 1826.

In May, 1816, the executors of Livingston, in pursuance of a power contained in his will, made out and signed and acknowledged a deed for the premises, to John Padgett junior, of Oxford in the county of Chenango ; and sent the same to Morris, the agent, to be delivered to the grantee therein upon being paid the balance due on the contract. On the 16th June, 1826, the father of the complainant confessed a judgment, for $104,99 in favor of the defendant George Farnham ; which judgment was docketed in the clerk's office of Chenango county the next day thereafter. And in December, 1826, an arrangement was made between Padgett and Farnham, by which the latter took an assignment of the Livingston judgment and a delivery of the deed for the premises, upon paying to the attorney of Livingston the amount of that judgment, and the deed was then put upon record. At the time that deed was dated and acknowledged, in May, 1816, there were three John Padgetts of Oxford in the county of Chenango ; to wit, the complainant, a minor then about eight years old, his father, and his grand father. The grand father was then blind and had been so for some years, and died in May, 1817. And one question presented by the bill was whether the legal title to the premises was conveyed to the complainant, by that deed, or to his father, by the description of John Padgett, junior.

The judgment confessed by the complainant's father in June, 1826, in favor of Farnham, not being paid, the latter took out an execution from the county clerk's office ; upon

which execution the sheriff sold the land, and the same was bid in by Farnham for the sum or price of $124,94. And on the 26th of May, 1829, the time for redemption having expired, the sheriff conveyed the premises to Farnham under that judgment and execution ; who thereupon took possession by his tenant. In October of the same year, Farnham conveyed the premises to the defendants Lawrence and Keese, with warranty, for the consideration of $800 ; which consideration was part of an antecedent debt then due and owing from him to them. And they continued in possession of the premises, by their tenant, until 1837, about two years after the death of the complainant's father ; when their tenant, upon being threatened with litigation, left the premises, and the complainant took possession. Lawrence and Keese having brought an ejectment suit to recover the possession, this bill was filed, in March, 1839.

In addition to these facts, as to which there was no dispute, the bill stated that the complainant's father, after he found that he could not pay for the premises according to his agreement with Walker, made an arrangement with his mother, Hannah Padgett, by which he agreed that if she would pay to Walker the $40, and would advance the monies then due on the contract to Livingston, he would get a deed for the lot in the name of his son the complainant ; that she assumed to make such payments ; that it was agreed the deed should be taken in the name of the complainant, for his use and benefit ; that she paid the $40, to Walker, and drew the bill of exchange on England, to be applied according to such agreement, by the complainant's father as her agent ; and that she afterwards advanced to him the balance due on the contract, which by an express agreement was to be applied by him as her agent in payment of the balance due on the contract, and a deed was to be taken in the complainant's name and for his sole use and benefit. The complainant also alleged in his bill that at the date of the deed he was called John Padgett, junior, although his grand father was then living ; because

the grand father was then blind and was not doing busi-
ness.    He also alleged that the judgment of Farnham was
paid before the sale of the premises under the execution
thereon.    But all these allegations were denied by the
answers.

   The cause was heard on pleadings and proofs.    The vice
chancellor decided and decreed that the defendants obtain-
ed no greater right or interest in the premises, under the
judgment and execution against the complainant's father,
than the father himself had at the time of docketing the
judgment against him ; that he received the money to pay
for the premises as the agent of his mother, and to pay
them over for the use and benefit of the complainant, and
to take a deed of the premises for him and in his name ;
that the deed taken in the name of John Padgett, junior,
was taken in the name of the complainant, he being the
junior of himself and his father, and that his father and
those claiming under him were estopped from claiming
that the conveyance of the premises was to the father and
not to the complainant, or that the latter was not the gran-
tee described in the deed ; that if the deed was taken in
the name of the complainant's father as the grantee therein,
the latter had only a nominal legal title to the lot, which
passed under the sheriff's deed, and that the complainant
was the cestui que trust and owner of the premises in equi-
ty, in fee simple.    He therefore decreed a release from the
defendants Lawrence and Keese to the complainant of all
their right and title to the premises which they had derived
under the conveyance from the defendant Farnham ; and
awarded a perpetual injunction, restraining the defendants
from proceeding in their suit at law or in any other suit
for the recovery of the premises, under the title derived
under the sheriff's deed or the deed from Farnham.    From
this decision and decree the defendants appealed to the
chancellor.

   *James Clapp*, for the appellants.    The deed was made
to and in the name of the complainant's father, and was
intended for him.    The judgment of Farnham against the

father of the complainant, was at the time of the sheriff's deed unsatisfied. If the evidence is admissible, it proves nothing but a parol agreement that the complainant's father should purchase the land and hold it in trust for the complainant. Such a parol agreement is void by the statute of frauds. (2 *R. S.* 134, § 6.) But· the evidence to establish this parol agreement is inadmissible. The declarations of the complainant's father cannot be received as evidence. He, if living, would have been a competent witness for the complainant. His declarations therefore cannot be given in evidence. (11 *John.* 185. 15 *Idem*, 493. 7 *Wend.* 752. 7 *John.* 95. 3 *Wend.* 180. 4 *Cowen*, 527.) His declarations also cannot be received, because they violate the rule that a title to land shall not be divested by parol. (4 *Cowen*, 427. 5 *Idem*, 485. 6 *Wend.* 233. 4 *Idem*, 442. · 5 *Paige*, 111.) The declarations of Hannah Padgett are inadmissible for the same reasons. The evidence does not establish a resulting trust in the complainant. Such a trust arises only by implication of law upon the actual payment, in money, of the whole consideration, or of an aliquot part thereof by the cestui que trust. The trust results only in favor of the party who advances the money. (2 *Paige*, 238. 2 *John. Ch. Rep.* 409. 2 *Atk.* 711. 4 *East*, 57. 7 *Cranch*, 176. 5 *John. Ch. Rep.* 19. 2 *Idem*, 409. 15 *Wend.* 647. 2 *Mad.* 114. 1 *Cox.* 15.) The complainant paid no part of the consideration money. A trust in favor of a third person can only be created by an express declaration ; and this must be in writing. (2 *Story's Com.* 444.)

*H. Vanderlyn*, for the respondent. The defendants have no˙ other or greater rights than the complainant's father would have, was he the defendant. A judgment is only a general lien on the land of the debtor, and the lien is subject to every equity which existed against the land in the hands of the debtor at the time of docketing the judgment. (4 *Paige*, 15. 6 *Idem*, 315, 316. 1 *Idem*, 128. 11 *Wend.* 447. *Idem*, 538. 6 *Paige*, 648.)

Judgments in a court of equity are binding only on the real beneficial interest of the judgment debtor in the lands on which such judgments are legal liens. The declarations of H. Padgett, and of John Padgett the complainant's father, were made before the purchase under the judgment against said John Padgett. They were admissible in evidence. They were as competent evidence as the declarations of the defendants would have been. (11 *Wend.* 536, 537. 7 *Idem*, 141. 14 *Idem*, 623, 235. 1 *Adol. & Ellis*, 114.) John Padgett, the father, undertaking to act as agent in obtaining the deed for the complainant, he could not purchase the lot for himself, and if he did take the deed in his own name, he would be considered in equity as holding the lot in trust for the complainant. (5 *Paige*, 656. 6 *Idem*, 364. 1 *John. Ch. Rep.* 397. 2 *Idem*, 257.) A trust resulted to the complainant. (2 *Paige*, 238. 1 *John. Ch. Rep.* 586.) A resulting trust may be proved by parol. (2 *P. Wms.* 549. 10 *Ves.* 517. 1 *John. Ch. Rep.* 588. 1 *Wend.* 648. 3 *Binney*, 304, 5. 19 *Wend.* 415.) If the father took the deed in his own name he became only a nominal trustee, and the complainant became the cestui que trust. And the acts of the father while such trustee cannot prejudice the equitable rights of the complainant. (1 *Cruise's Dig. tit.* 12, *Trust, ch.* 4, § 6. 4 *John. Ch. Rep.* 138.)

THE CHANCELLOR. If the vice chancellor was right in the conclusion at which he arrived in the first branch of the decree in this case, that the complainant was the nominal grantee in the deed from the executors of Livingston, and that the legal title did not pass to the father of the complainant subject to a trust resulting by implication of law, the bill should have been dismissed. For in that case the complainant had a perfect defence to the suit at law which had been brought against him by Lawrence and Keese ; and he had no right to come into this court, for an injunction, to deprive them of their legal right to a trial by jury to determine the question of fact whether the com-

plainant or his father was the grantee in the deed of May, 1816. I think, however, the vice chancellor arrived at the wrong conclusion upon this question of fact; and that if the complainant has any right to the premises in controversy it must be upon the ground of a trust arising in his favor by operation of law.

The description of the grantee in the deed, in this case, has reference to the time when it was dated and acknowledged, and was placed in the hands of Morris, the agent, to be delivered when the small balance of the purchase money then estimated as due should be paid. And if the father of the complainant was the person intended, by the description of "John Padgett, junior, of Oxford," at the date of the deed in May, 1816, he was still the grantee at the time it was actually delivered to the defendant Farnham, for him, ten years afterwards; although the elder John Padgett of Oxford, had died in the mean time. The word junior forms no part of the name of the grantee, but is merely descriptive of the person; and is usually adopted to designate the son where the father bears the same christian name as well as the family name. Where the word junior is left out, it is only presumptive evidence that the oldest person of the name, and who will answer the other matters of description in the deed, was the grantee intended; and the presumption may be rebutted by showing that the grantor intended to convey to the son by the name and description contained in the deed. (*Lepiot* v. *Browne*, *Holt's Rep.* 4. 6 *Mod. Rep.* 198, S. C. *People* v. *Collins*, 7 *John. Rep.* 549. *Kincaid* v. *How*, 10 *Mass. Rep.* 203.) Here the name and description of the grantee to whom the deed was to be delivered, and in whose favor the grantors intended it to operate as a conveyance of the legal title to the premises in question, was undoubtedly derived from Morris, their agent, at the time he remitted the draft on England. And they probably intended to convey to the person whom he then represented to them as having become entitled to Walker's interest in the premises, under the contract of 1809. To ascertain who

that was, we must resort to Morris' testimony and to the facts then within his knowledge.

The evidence on the part of the defendants clearly shows that the father of the complainant was known as John Padgett, junior, long after the elder John Padgett had become blind and discontinued business. And he was sued by that name and description in 1815, in which suit. the judgment upon the report of referees was entered in February, 1816. Morris also says that when Padgett came to him with Walker's contract, which was in January, 1816, he told him he had a father living, whose name was John, and had a son of the same name. And if the subsequent declaration of Morris to Walker could be received as evidence, it would show that he must have been requested at that time to send for the deed in the name of John Padgett, junior. That the person who gave that direction understood the designation of junior as applying to himself, at that time, is shown by the fact that he had, on a former occasion, refused to answer to the name of John Padgett; insisting that he was John Padgett, junior. It is wholly improbable therefore that he would have requested to have the deed in the name of John Padgett, junior, or that Morris would have directed it to be made in that name, without any other designation, at the time this bill of exchange was delivered in January, 1816, if either of them had then understood that the conveyance was to be made to the complainant; who was then but seven or eight years old. The receipt for the draft on England, which was given at that time, also shows who was understood by all parties to be John Padgett, junior. For that receipt shows that the draft, which the complainant's father received and negotiated to Morris, was drawn in favor of the person to whom the receipt was given; who is therein designated by the addition of junior to his name. And no one can for a moment suppose that the bill of exchange was made payable to the infant John Padgett, and not to his father. I think there is very little room to doubt, therefore, that Morris was requested at that time to send for the deed to

be made out to John Padgett, junior ; and that it was then intended that the complainant's father should be the grantee in the deed, by that description. That Morris must so have understood it is evident from another fact which occurred before any controversy had arisen on the subject. I refer to the endorsement made upon the contract, in May, 1824, when the complainant's father, who had then become John Padgett the elder, gave his note for the balance which was then due. In that endorsement the addition of junior is no longer retained ; but it is stated that when the note shall be paid a deed will be delivered to John Padgett or his assigns. And it must also be recollected that Morris then had in his possession the deed to the complainant's father, which had been made out to him eight years before, with the addition of junior to his name, and ready to be delivered when the note for the balance of the purchase money should be paid. And this was the deed which was actually delivered to John Padgett, or to Farnham for him and with his assent, in December, 1826. Upon the whole evidence in the case, therefore, I have arrived at the conclusion that the father of the complainant was understood and intended to be the grantee of the premises, in the deed of May, 1816, by the name and description of John Padgett, junior, of Oxford ; and for whom that deed was subsequently delivered to Farnham, by the direction of Morris, under the arrangement testified to by Col. Clapp. The legal title to the land therefore was in the complainant's father at the time of the sale of the premises by the sheriff, and passed to Farnham under the sheriff's deed.

At the time of the purchase of the premises by Farnham, at the sheriff's sale, the judgment of June, 1826, was a legal lien upon the equity of redemption of the complainant's father in the old farm. And it appears from the testimony that the value of that farm, at the time of the foreclosure of the mortgage thereon to Walker, was much greater than the amount due on that mortgage. But the judgment of Farnham having been discharged of record, by the sale on the execution, the foreclosure would cut off the lien of that

judgment upon the equity of redemption in the old farm. Farnham therefore probably lost his security for his debt by purchasing the Carson lot at the sheriff's sale. I am not, therefore, prepared to say that he and those claiming under him might not have claimed protection, as bona fide purchasers, if they had set up that defence in their answers, even if a resulting trust is established by the testimony. As a general rule, a purchaser of the legal title, who receives his conveyance merely in consideration of a prior indebtedness, is not entitled to protection; because he has lost nothing by the purchase. But the relinquishment of a valid security, which he before held for his debt, and which cannot be revived so as to place him in the same situation substantially as to security as he was in prior to his purchase, may of itself be sufficient to entitle him to protection as a bona fide purchaser.

Upon the question whether a resulting trust is established in this case it may be necessary to advert to the testimony as to the declarations of the complainant's father, and grand mother, for the purpose of seeing how far those declarations were admissible in evidence. As a general rule, declarations made by a person in possession of real estate, as to his interest or title in the property, may be given in evidence against those who subsequently derive title under him; in the same manner as they could have been used against the party himself if he had not parted with his possession or interest. On the other hand it is equally well settled that no declarations of a former owner of the property made after he had parted with his interest therein, or which are overreached by the purchase of the party claiming through or under him, can be received in evidence to effect the legal or equitable title to the premises. (1 *Cowen & Hill's Notes to Phil. Ev.* 644, 655.) Here the title of the defendants relates back to the docketing of the justice's judgment, in June, 1826; or rather to the time of the delivery of the deed from Livingston's executors to Padgett, on the 14th of December thereafter, when that judgment became a lien upon the legal title of

1843.

Padgett
v.
Lawrence.

Padgett in the premises. And all declarations or admissions made by him subsequent to that time, either in favor of or against the validity of the title acquired under the deed of May, 1816, must be rejected as illegal and improper evidence.

The declarations or admissions of third persons are not legal evidence to establish or destroy a title to land, or to prove or disprove the existence of a trust, except as against those who have derived title to the premises in controversy from the persons making the declarations or admissions, and by a title subsequent. All the declarations of Hannah Padgett, therefore, which were not made in the presence of her son and either actually or tacitly assented to by him, should be rejected as illegal and improper evidence to prove the existence of any fact in this case. And after rejecting the admissions and declarations which ought not to have been received, there is not sufficient evidence in this case to satisfy me of the actual existence of a trust arising out of any valid agreement between Hannah Padgett and her son. The mere payment of the money by her would not raise a trust by implication, in favor of a third person, without the existence of an actual and binding agreement on the part of her son to transfer his interest in the land to the complainant and to take a conveyance therefor in his name. A trust resulting from the mere payment of the money by Hannah Padgett would be a resulting trust in her favor; which trust, upon her death, would have descended to her children, and not to the complainant.

It is always unsafe to rely upon the uncertain recollections of a witness as to the existence of a contract, or agreement, which is to impair the title to real estate. And it may be remarked in this case, that although Walker recollects very distinctly the conversation which he had with Hannah Padgett from twenty to twenty-five years previous to the time when he is called upon as a witness, he is unable to tell whether that conversation took place before or after the death of her husband; though he thinks it was afterwards. If he is right in this last supposition, I am sat-

isfied this decree cannot be sustained. For his testimony would in that case directly contradict the allegation in the bill that the bill of exchange on England was given for the purpose of carrying into effect the supposed agreement attempted to be proved by Walker and his wife. And it must be recollected that nothing was ever paid upon the contract, after the drawing of that bill of exchange in January 1816, until several years after the death of Hannah Padgett; when the defendant Farnham paid the judgment · against her son, and took an assignment of it. No trust by implication of law, therefore, could arise out of a mere promise on the part of Hannah Padgett, to Walker, to pay the balance due on the contract which remained unpaid at the death of her husband, in 1817.

The testimony of Walker and wife, to whatever time it relates, does not prove the agreement stated in the bill. Walker says he first applied to Padgett, who said he could not pay, but he did not know but his mother would; not that Padgett authorized the witness to contract for a surrender of his interest in the contract to her. The witness then went to see her, but not in company with her son, and she promised Walker that she would pay for the land and take a deed for little John. That conversation therefore created no trust; nor did it constitute an agreement on the part of the complainant's father to relinquish his interest in the contract and to give up the land to his son. And the testimony of the complainant's sister, as to what occurred in 1821, even if the witness' recollection could be relied upon as to a conversation which occurred eighteen years before, when she was a mere child, does not establish the agreement set out in the complainant's bill. Padgett had probably at that time become embarrassed, and his mother was unquestionably solicitous to have him take the conveyance in the name of his son, so as to secure the property to the latter. But the testimony is altogether too loose and vague to justify this court in declaring a resulting trust, which is to unsettle the title to real estate after all the parties are dead who could explain the real facts of the case. I may also remark, that

the testimony of the uncle of the complainant, as to Hannah Padgett's want of pecuniary means for some time previous to her death, renders it highly improbable that she should, in 1821, have furnished the money to pay off what was then due on the contract. The more rational conclusion is, that the son applied to her for the loan of a small sum, and that she took that occasion to urge him to secure the farm for the grandson, by taking a deed in his name ; and that he replied " well," to put an end to importunity on that subject.

The fact that there was no attempt to set up this claim in the lifetime of the complainant's father, although he lived between five and six years after possession of the Carson lot was taken under the sheriff's deed, and after the complainant became of age in 1829, is also a very strong circumstance against the probable justice of the claim which was subsequently set up. I have not therefore found sufficient legal testimony in this case to sustain a decree establishing a resulting trust in favor of the respondent. And as the whole of the decree appealed from is erroneous, it must be reversed ; and the bill must be dismissed with costs.