(25 App. Div. 34.)

MARSH et al. v. NE-HA-SA-NE PARK ASS'N.

(Supreme Court, Appellate Division, Third Department. January 12, 1898.)

1. EVIDENCE—DECLARATIONS—TITLE.
   Declarations of the owner of land that he had sold it are inadmissible to defeat his title thereto, or that of his descendants or their grantees, derived through him.

2. SAME—LOST DEED—SECONDARY EVIDENCE.
   A lost deed to land cannot be proved by the mere declarations of the deceased owner of the land, contained in letters and memoranda left by him, that he had sold the land; such lost deed not being accounted for.

3. BOUNDARIES—EVIDENCE.
   Letters and memoranda left by a deceased owner of land, to the effect that he had sold certain portions of the land, are not competent evidence, as explanatory of the boundary of the land intended to be conveyed by the several descendants of deceased by quitclaim deeds, in which they conveyed "whatever the deceased owned, or may have owned, on the northeast quarter of township 38 at the time of his death."

4. TAX SALE—JURISDICTIONAL DEFECTS—TAX DEEDS—CURATIVE ACTS.
   Where a tract of vacant land, assessed as a whole, was sold to the state in 1843 for the taxes of 1836, 1837, 1838, and 1839, and the taxes on a portion of the land had been paid for 1836 and 1837, and the comptroller's deed dated, November 4, 1845, was duly recorded in the office of the secretary of state, the irregularity in the tax sale, not being jurisdictional, is cured (unless it has been seasonably attacked) by Laws 1885, c. 448, and Laws 1893, c. 711, providing that all tax deeds theretofore executed, which have been recorded for two years, shall be conclusive evidence that the sale and proceedings prior thereto were regular.

5. TAX DEED—UNCERTAIN DESCRIPTION.
   A comptroller's tax deed to the state, which excepted from the grant "250 acres in the northeast corner of the northeast quarter" of a certain township, is not void on its face, for uncertainty of description.

6. SAME—HOW CONSTRUED.
   The exception of land in a tax deed should be construed favorably to the owner, and the excepted land should be located, if possible, and in a manner as favorable as possible to the owner.

   Putnam, J., dissenting.

Appeal from trial term, Fulton county.

Action by Lelia E. Marsh and another against the Ne-ha-sa-ne Park Association to recover possession of a certain tract of real estate. Judgment for plaintiffs. (42 N. Y. Supp. 996.) Defendant appeals. Reversed.

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

Charles E. Snyder, for appellant.
Frank E. Smith, for respondents.

LANDON, J.   I agree with Mr. Justice PUTNAM that the plaintiffs proved a paper title to five-sixths of the lands described in the complaint, under the patent to Alexander Macomb of 1787.   But I think that such title was devested by the comptroller's deed to the state under the tax sale of 1843, for the reason that chapter 448, Laws 1885, and chapter 711, Laws 1893, limited the time in which the presumptive evidence of the validity of the title given by that deed to the state could be controverted, and, that time having expired before this action was commenced, the deed has become conclusive evidence of the validity of the title thereby conveyed to the state.   Such, I think, is the effect we must give to the statutes of 1885 and 1893, under the authority of People v. Turner, 145 N. Y. 451, 40 N. E. 400, affirmed by the United States supreme court (Oct. term, 1897) 18 Sup. Ct. 38.   The comptroller's deed is dated November 4, 1845, and was recorded in the office of the secretary of state.   September 27, 1855, the people of the state, by letters patent, conveyed the premises to the Sacket Harbor & Saratoga Railroad Company.   The defendant is the grantee of the said railroad company's grantees, by deeds duly recorded more than two years before the commencement of this action.   The comptroller's sale was made in 1843, and was irregular, and could have been vacated, if it had been seasonably attacked.   Prior to the statute of 1885, the comptroller's deed was only presumptive evidence of the regularity, and consequently of the validity, of the sale.   Laws 1855, c. 427, § 65. The return to the comptroller of the unpaid taxes for the years 1836, 1837, 1838, and 1839 shows the assessment to have been upon the entire township No. 38, containing 20,000 acres, except certain designated parts thereof, which either were not embraced in the assessment, or upon which the taxes had been paid.   Among the excepted parcels for the years 1836–37 was the N. E. ¼ (5,000 acres), which quarter embraces the locus in quo, upon which the taxes for 1836–37 were paid before return was made to the comptroller.   But the taxes upon the N. E. ¼ for the years 1838–39 were unpaid, and the comptroller, therefore, had the right to sell the quarter.   But as the township was wild forest land, with no visible allotments into the respective parcels of the several owners thereof, the N. E. parcel was taxed as part of the larger parcel, from which it was not visibly separated.   This was permissible.   Upon other portions of the larger parcel the taxes of 1836–37. were unpaid, and also the taxes for 1838–39.   The comptroller sold the larger parcel, embracing the N. E. ¼, and thus the locus in quo, for all the unpaid taxes for the years 1836, 1837, 1838, and 1839.   Under the laws then existing, the owner of the N. E. ¼ could not have redeemed it by paying the amount properly chargeable upon it, but he would have been obliged to pay the proportion of the unpaid taxes upon all the parcels which his acreage bore to the whole acreage; and, as that amount was increased by the taxes of 1836–37 upon the other parcels, the owner of the land would have been obliged to pay more than he owed.   The sale,

therefore, was invalid; and, no doubt, it would have been so held, if it had been seasonably attacked. People v. Hagadorn, 104 N. Y. 516, 10 N. E. 891.

Section 12, c. 711, Laws 1893, is as follows:

"Effect of Former Deeds. Every such conveyance heretofore executed by the comptroller, county treasurer or county judge, and all conveyances of the same lands by his grantee or grantees therein named, which have for two years been recorded in the office of the clerk of the county in which the lands conveyed thereby are located, and all outstanding certificates of a tax sale heretofore held by the comptroller, that shall have remained in force for two years after the last day allowed by law for redemption from such sale, shall be conclusive evidence that the sale and proceedings prior thereto, from and including the assessment of the lands, and all notices required by law to. be given previous to the expiration of the time allowed for redemption, were regular and regularly given, published and served according to the provisions of all laws directing and requiring the same or in any manner relating thereto, but all such conveyances and certificates, and the taxes and tax values on which they are based, shall be subject to cancellation on direct application to the comptroller, or in an action brought before a competent court therefor by reason of the payment of such taxes, or by reason of the levying of such taxes by a town or ward having no legal right to assess the land on which they are laid, or by reason of any defect in the proceedings affecting the jurisdiction upon constitutional grounds."

Every objection urged in this case to the validity of the comptroller's sale of 1843 is covered by the terms of this statute. The state was the purchaser at that sale, and, if the comptroller could have canceled the sale, the owner had his opportunity to have his day in court before that officer. The distinction between the case where the state is the purchaser, and where an individual is the purchaser, is stated by the court of appeals in the Turner Case, and referred to as unimportant in the opinion in the supreme court of the United States in the same case. Referring to the case of People v. Roberts, 151 N. Y. 540, 45 N. E. 941, since the owner had his opportunity to seek his remedy in the supreme court, whether he had one before the comptroller or not. The answer to the plaintiffs' contention that it is sought to deprive them of their property without due process of law is that the state gave them, or their grantor, the opportunity to protect their land by due process of law, and they would not resort to it. But can a person, upon whose estate an unlawful charge has been placed, be put to the cost and trouble of a proceeding to remove the charge, under peril of losing his estate? Yes. When danger threatens, we must resort to whatever measures are needful to avert it, or abide its perils. The state must collect its taxes; it may make mistakes in doing so; and it is not unreasonable, especially in respect to unoccupied lands, that the owners of such lands should be charged with the burden of showing the mistake within a reasonable time. In such case the land is taxed, not the owner; the owner knows his land is subject to taxation, and that he must protect it from sale, or lose it. If the owner had been in possession of the lands, then I think it quite probable that a different rule would apply, for the reason that statutes of limitation do not give validity to bad or imperfect titles, as against a possessor who is not given notice to defend against them until after the limitation has expired. They are shields for the defense of the pos-

sessor, not weapons for his eviction.    Joslyn v. Pulver, 59 Hun, 129, 13 N. Y. Supp. 311, affirmed Joslyn v. Rockwell, 128 N. Y. 334, 28 N. E. 604.    But, when he is out of possession, non constat but that he is out because he has no right to be in; and hence there is no apparent reason why, when he is absent and silent during all the time the statute allows him to protect his title against the proceeding of the state to confiscate it, he should not be held to have abandoned it, or to have admitted the right of the state to devest him of it.

There is in this case no constitutional question respecting the imposition of the taxes.    There is no constitutional provision respecting any particular procedure to be pursued by the comptroller in selling lands upon the nonpayment of taxes thereon.    There is none in respect to redemption.    This sale was not upon account of the taxes which had been paid, but for the unpaid taxes.    I concede that, if the sale had been upon account of the taxes for 1836–37 which had been paid, the sale would have been void, beyond the power of any statute to cure or validate it.    The purpose of these ·statutes is to collect unpaid taxes, and, if the taxes have been paid, the statutes do not apply.    If the comptroller should make a sale, it would not be for unpaid taxes; and he has no jurisdiction to sell, and can be given none to make a tax sale, when there is no tax unpaid.    Calling it a tax sale would not make it such.    I doubt whether the statute quoted declares that the comptroller's deed is evidence that the tax had not been paid.    But, if it does so declare, I think the fact may be shown to be otherwise, upon the same principle that you may attack a judgment by proving that no summons was served, or jurisdiction otherwise acquired.    The same rule should apply if the tax was unconstitutionally laid, because a constitutional tax, and its nonpayment, lie at the foundation of the power to sell; and you cannot, in such cases, by a subsequent statute, give jurisdiction nunc pro tunc, so as to supply the original lack of it, however it may be with a curative statute, that still preserves for a reasonable time, before another forum, the party's constitutional rights.   Of course, these questions are not before us.    I refer to them in the hope that they serve to make my meaning clearer upon the question ·that is before us.    But the taxes for 1838–39 were not paid, and the sale was for such unpaid taxes.    The comptroller had jurisdiction to make that sale, and ought to have observed the statutory regulations then in force.    He made the sale, and it is now challenged because he did not observe the statutory regulations, but disregarded them, by selling this land in a parcel, which embraced other lands upon which the taxes for four years (1836, 1837, 1838, and 1839) were unpaid.    Thus, the form and manner of the sale are now attacked.    That means that the comptroller, in making the sale, abused his jurisdiction as to form and manner, or erred in exercising it,—nothing more.    The unpaid taxes were like a judgment, and the comptroller's sale is like a sheriff's sale upon execution, which may be vacated, if not made in proper form and manner.    But the owner, like the judgment debtor, may waive the irregularities.    Neither can get rid of tax or judgment, except by paying it; and it may not be worth his while to take the trouble to move, when the successful result of his motion will still

leave tax or judgment unsatisfied. It is obvious that these irregularities are not jurisdictional, in the sense that they lie at the foundation of the comptroller's power to sell, or that they take it away from him altogether, but only in the sense that his power to sell in this form and manner may be challenged, and such sale set aside. Ensign v. Barse, 107 N. Y. 329, 14 N. E. 400, and 15 N. E. 401. This is very different from a sale where there are no taxes unpaid. The one cannot be made at all, and the other ought to be made in due form and manner. The one cannot be cured, the other ought to be; and after a reasonable lapse of time it should be regarded as cured, if the owner, meantime, makes no objection. It is proper to have evidence of this waiver, and this the comptroller's deed, two years after its record, affords. In this case the time allowed for the owner to complain expired, and the owner did nothing. The statutes declare, in effect, that his day has gone by, and that the comptroller's deed is therefore conclusive evidence of the material facts which the plaintiffs now seek to controvert.

I do not think the comptroller's deed to the state was void on its face for uncertainty of description. The alleged uncertainty is in regard to the land excepted from the grant, namely, "250 acres in the northeast corner of the northeast quarter." Suppose the exception void for uncertainty; then there is no exception from the grant. But the exception in a tax title should be construed most favorably to the owner, since no more land should be sold than is necessary, and the excepted land should be located, if possible, and in a manner as favorable as possible to the owner. The corner is a base point from which two sides of the land excepted can extend an equal distance along the intersecting boundaries, so as to include, by parallel lines, the 250 acres. Jackson v. Vickory, 1 Wend. 407; Dolan v. Trelevan, 31 Wis. 147; Bowers v. Chambers, 53 Miss. 259; Doe v. Clayton, 81 Ala. 391, 2 South. 24. I think this location was intended, and should be adopted.

As to the exception from the comptroller's deed of lots 2, 3, 6, 7, 8, and 9 in Gorton's tract, the deed is not void on its face for lack of certain description. The uncertainty arises from the lack of extrinsic evidence locating the tract and the lots. The defendant did not need to furnish it. The action is ejectment, and plaintiffs must show title to the lots before defendant could be put to its proof. If plaintiffs had shown such title, they would have shown the certainty of the description. I advise a reversal.

All concur, except PUTNAM, J., dissenting.

PUTNAM, J. (dissenting). The plaintiffs brought this action to recover possession of the N. E. $\frac{1}{4}$ of township 38 in Totten & Crossfield's purchase in the county of Hamilton, containing 6,300 acres (excepting therefrom 1,000 acres conveyed by James Barrow to James Bennett by deed dated October 13, 1833), and recovered judgment in the court below for an undivided five-sixths thereof. On the trial, plaintiffs claimed title under a patent dated February 28, 1787, from the state to one Alexander Macomb; a conveyance from Macomb to William Edgar on the 5th day of July, 1791; and a deed from the latter to James Barrow on the 20th day of June, 1821. Deeds from

those succeeding to the title of James Barrow, and their successive grantees, down to the plaintiffs, were also read in evidence. The principal questions submitted for our consideration are: First. Did the plaintiffs prove the title acquired by James Barrow under the Macomb patent to be vested in them? Second. Were the tax sale of 1843, and the comptroller's deed thereunder, through which the defendant claims, effectual to devest the rights of the plaintiffs or their grantors, holding under the Macomb patent?

The plaintiffs, having read in evidence the conveyance from the state to Macomb of the lands in question, and the other deeds above mentioned, established an apparent title to said premises, unless the declarations made by James Barrow while he was the owner thereof lead to a different conclusion. On the 15th day of October, 1839, James Barrow made the following statement in a letter:

"It is also important for me to know what is my remedy against those to whom I have sold parcels of my land, some of which was made as early as 1822-23, and subsequent in 1833, when I sold the last parcel, and have from that time reserved but 250 acres, in the extreme northeast corner of the township."

And on the 16th day of December, 1893, in a letter to the comptroller, he said:

"I will esteem it a particular favor, would you, with as little delay as possible, let me know what were the assessments of the years 1828, 1829, 1830, for each year, previous to which years I had sold 1,900 acres, leaving me the charges upon 4,000 acres, which I was bound to pay, including 1830, since which year I had made sale of most of the residue of the original 5,980 acres; leaving me to pay taxes for 1830, to this time, on 250 acres."

The following memoranda, in the handwriting of James Barrow, on statements of taxes, were also read in evidence:

"J. Barrow sold his interest in the above lands, except 250 acres, as far back as 1830. James Barrow."
"Sold all my interest in the 5,980 acres, except 250 now retained in the extreme N. E. ¼ of the township, taxes upon which are now paid to and inclusive for 1842. James Barrow.
"February, 1844."

These declarations of Barrow refer to the premises in question. It is conceded that although, in such declarations, Barrow stated that he had sold all of the premises in question, except 250 acres, more than 50 years before the trial, no deed or deeds showing such sale or sales are on record; nor is it claimed that any grantee or grantees have made any claim or asserted any title to said lands thereunder. The will of James Barrow, through whom plaintiffs' title is derived, devised the premises in question, in the residuary clause thereof, in the following language:

"II. All the rest and residue of my estate, not specifically disposed of, whether real or personal, and wherever situated, I give, devise, and bequeath equally to my children who shall survive me, share and share alike, to each."

The plaintiffs have succeeded to the title of such devisees. Although in four of the deeds of said children, or their descendants, to Richard Pattison, plaintiffs' grantor, the land conveyed is described as land that was owned by James Barrow at the time of his death, and the fifth deed conveys whatever interest the parties of the first

part may have as heirs at law of James Barrow, deceased, if any, such deeds were sufficient to convey such title to the premises in question as was devised by James Barrow to his children. The question then arises whether or not the plaintiffs, who have succeeded to the title of James Barrow, are to be devested of their rights to the premises in question because of declarations made by said deceased, more than 50 years before the trial, that he had sold the premises; no deed evidencing such sale being on record, and it not being claimed that any grantee has asserted any claim thereunder, and the defendant not claiming under any conveyance by said Barrow, and not seeking to prove the execution of any lost deed or deeds from him. It is a well-settled principle that:

"The declarations of a party in possession are admissible in evidence against the party making them, or his privies in blood or estate, not to attack or destroy the title, for that is of record, and of a higher and stronger nature than to be attacked by parol evidence. They are competent simply to explain the character of the possession in a given case." Jackson v. Shearman, 6 Johns. 19; Jackson v. Cary, 16 Johns. 302; Gibney v. Marchay, 34 N. Y. 301; McDuffie v. Clark, 39 Hun, 166–170; Dodge v. Trust Co., 93 U. S. 379–383; Jackson v. Miller, 6 Cow. 751; Jackson v. McVey, 15 Johns. 234.

We have examined the greater part of the authorities relied upon by the learned counsel for the appellant, and are of the opinion that neither of them are in conflict with those above cited. There are many cases holding that the declarations of a vendor may be shown, when tending to characterize his possession. Sweetenham v. Leary, 18 Hun, 284; Sheldon v. Van Slyke, 16 Barb. 26; Jackson v. Dobbin, 3 Johns. 223; Jackson v. Bard, 4 Johns. 230; Baird v. Slaight (Sup.) 8 N. Y. Supp. 603; Edmonston v. Edmonston, 13 Hun, 133; Vrooman v. King, 36 N. Y. 477; Pitts v. Wilder, 1 N. Y. 525. Parol evidence may be given to identify the grantee in a deed. Padgett v. Lawrence, 10 Paige, 170. Or declarations of a party tending to show a delivery of a deed. Jackson v. Myers, 11 Wend. 533; Lucky v. Odell, 46 N. Y. Super. Ct. 547; Shrader v. Bonker, 65 Barb. 608; Varick v. Briggs, 6 Paige, 323; Fleck v. Rau, 9 App. Div. 43, 41 N. Y. Supp. 64; Lyon v. Ricker, 141 N. Y. 225, 36 N. E. 189. Declarations of the owner of real estate, at a public sale, as to his title, have been allowed, as tending to establish an estoppel. Mattoon v. Young, 45 N. Y. 696. In actions for a specific performance of an oral contract for the sale of real estate, declarations of the owner tending to show such contract have been held competent. Chadwick v. Fonner, 69 N. Y. 404; Rose v. Adams, 22 Hun, 389. Also, on questions of boundary. Pettit v. Shepherd, 32 N. Y. 97; People v. Storms, 97 N. Y. 364; Coleman v. Improvement Co., 94 N. Y. 229; Abeel v. Van Gelder, 36 N. Y. 513. Such authorities, however, do not conflict with those to which I have referred, which determine that parol declarations of the owner of land are inadmissible as evidence to defeat his title. In Jackson v. Shearman, supra, the declarations of the owner of the real estate therein in question, held not competent to be received as evidence of title, referred to an alleged conveyance made by such owner. The defendant does not seek to prove the execution of any lost deed or deeds. He rests his case on the admissions of Barrow, as showing that he had ceased to have any title

to the lands in question at the time of his death.    Had the defendant sought to prove that Barrow had executed a deed or deeds, which were lost, and the contents thereof, he would have been confronted with the rule that:

"Parol evidence to establish the contents of a lost deed should be clear and certain.    It should show that the deed was properly executed, with the formalities required by law, and should show all the contents of the deed,—not literally, but substantially.    If anything less than these requirements would suffice, evil practices, which it was the object of the statute of frauds to prevent, would be encouraged."    Edwards v. Noyes, 65 N. Y. 125–127.

If, on a question of title, the contents of a lost deed may not be shown unless the conveyance be proved to have been properly executed, with the formalities required by law, and its provisions be also substantially shown, it would seem to follow that mere declarations of Barrow that he had sold the premises in question could not be received in evidence to affect his title thereto.    The defendant sought to show by statements of Barrow that he had conveyed all the land sought to be recovered in the action, except 250 acres thereof. Its contention, in fact, was based on lost deeds made by Barrow, the execution of which was proved by his declarations.    But the grantees in such deeds were not shown, or the dates of the execution thereof, or substantially the contents of such conveyances; nor was it proved that they were executed in the form required by law.    Under the rule above referred to, it is quite clear that the declarations of James Barrow above quoted cannot be deemed competent or sufficient evidence to establish title to the land in question out of him at the time of his death.

Nor can the contention of defendant that the letters and memoranda of the said Barrow were competent, as explanatory of the boundary of the land intended to be conveyed by the several descendants of said deceased to plaintiffs' grantor, Pattison, be sustained.    In the first place, these letters and memoranda were not declarations of the several grantors in such deeds, and hence cannot be deemed competent to show their intention in executing the same.    Again, the letters between George N. Ostrander and James T. Barrow, and the testimony of the latter, leave no doubt as to the intent of the parties. In the letter of December 15, 1892, Ostrander makes an offer of $400 for any interest that the two daughters of James Barrow may have in the N. E. ¼.    James T. Barrow testified:

"I stated to Ostrander, at the conversation I had with him at my house, that the papers of my grandfather, which I had of his, did not show that he owned more than 250 acres in that township.    Ostrander said he would not be satisfied with a deed of 250 acres; he would like a deed covering the whole northeast quarter, that my grandfather originally owned.    I told him that he did not own it; that I certainly would not give a deed to what he did not own.    Ostrander then suggested that we should give a deed, wording it, 'Whatever James Barrow owned, or may have owned, in the northeast quarter of township 38 at the time of his death.'    He did not have any deed there at that time.    He subsequently brought them personally, or sent them by mail. After Ostrander requested me to make this quitclaim of whatever interest James Barrow had at the time of his death, I consented to have the deeds written that way, after consulting with the other parties."

There was no misunderstanding between the parties. Ostrander insisted on a deed conveying the whole N. E. ¼ of township No. 38, that James Barrow originally owned, and the deed was finally drawn so as to convey the whole of that quarter. The parties clearly understood each other. Those deeds were intended to convey to Pattison the whole of the N. E. ¼ of township No. 38, unless some part thereof had been conveyed by James Barrow. They had the effect that they were intended to have. Under said conveyance, Pattison became vested with the whole of the N. E. ¼ of township 38, unless it was made to appear by competent evidence that some part thereof had been conveyed by James Barrow, deceased. As we have seen, no such evidence was produced upon the trial by the defendants.

I conclude, therefore, that the plaintiffs established their right to the land awarded to them by the judgment, unless the title of Barrow was devested by the tax sale of 1843, and the comptroller's deed thereunder to the state in 1845. The state on February 27, 1855, conveyed the premises to the Sacket Harbor & Saratoga Railroad Company. The defendant on the trial read in evidence a number of conveyances showing a devolution of the title thus conveyed to the Sacket Harbor & Saratoga Railroad Company to it; the last deed bearing date on June 15, 1894, made by William Seward Webb and wife to the defendant. At the time of the tax sale of 1843, the title to the premises in dispute, under the patent granted to Alexander Macomb on February 28, 1787, was in James Barrow; and, unless devested by the tax sale of 1843, it remained in him or his descendants until 1893,—a period of 50 years. Since the patent granted by the state to the Sacket Harbor & Saratoga Railroad Company in 1855, the title, as thus conveyed, has been transferred to and held by successive owners, down to the plaintiffs, unassailed by Barrow or his descendants, or any other person, until the commencement of this action in 1895,—a period of 40 years since the issuing of said patent. The facts in regard to the tax sale of 1843 are as follows: For the years 1836, 1837, 1838, and 1839, township 38, consisting of 20,000 acres, in Hamilton county, was assessed as one tract, and thus returned to the comptroller. After such return, and before the sale, the taxes for the years 1836 and 1837 on the land in question were duly paid. For the years 1838 and 1839 the taxes thereon had not been paid, so that in 1843, when the sale in question was had, there was a tax amounting to $33.77 for the year 1836, and $43.64 for the year 1837, due from the owners of other portions of the township; the tax for those years on the premises in question having been paid. There was also for the year 1838 an unpaid tax of $93.97, and for the year 1839 $129.81, due from the owner of the N. E. ¼, and other owners of land in the same township. The comptroller added together the unpaid taxes for said four years, amounting to $301.19, and sold, to pay those taxes, in one tract, at one sale, 12,404 acres of land, the portion of said township on which was unpaid the taxes of 1839, including the N. E. ¼. The tract was bid in by the state for $420.10, the amount of taxes, interest, and costs, and the defendant's title is derived under said sale.

The statute provided:

"Whenever a sum in gross is assessed upon a tract, piece or lot of land any person claiming a divided or undivided part thereof may pay to the treasurer any part of the tax, interest and charges due thereon proportionate to the number of acres claimed by him on the certificate of the comptroller, and the remaining tax, interest and charges shall be a lien on the residue of the land only."

Therefore when the sale of 1843 was made the N. E. ¼ of township 38 (the taxes thereon for the years 1836 and 1837 having been paid) was released from the lien thereof. The unpaid tax for those years was only a lien on the other portions of the township. Yet the comptroller sold the N. E. ¼ for the taxes of 1836 and 1837, as well as for the taxes for the years 1838 and 1839. In other words, he sold the land in question for the taxes due from other parties,—for taxes not a lien upon it. The owner of the N. E. ¼ was injured by such a sale, because, although he could redeem therefrom, to do so, under the provisions of the statute, he was compelled to pay "such proportion of the purchase money and interest, as the quantity of acres shall bear to the whole quantity of acres sold." In other words, to redeem, such owner would have been compelled to pay a portion of the tax assessed against the owners of the other portions of township 38, and none of which was a lien on his lot. Therefore in the sale of 1843 the plaintiffs' land was sold for the taxes of 1836 and 1837, due from other parties, and which were not a lien thereon, as well as for the taxes of 1838 and 1839, for which the said land could have been legally sold. It is clear that the comptroller should have sold separately those portions of township 38 on which the taxes for 1836 and 1837 had remained unpaid, for such taxes, and that he had no right to sell the plaintiffs' lot therefor.

It remains to be considered whether, as the comptroller was authorized to sell for the taxes of 1838 and 1839, his unauthorized act in selling at the same sale the N. E. ¼ for the taxes of 1836 and 1837 did or did not constitute an incurable jurisdictional defect in his proceedings. Such defect, if not jurisdictional, may be deemed cured by the provisions of chapter 448, Laws 1885, and chapter 711, Laws 1893. It has been determined that the act of 1885, supra, did not cure jurisdictional defects. Joslyn v. Rockwell, 128 N. Y. 334, 28 N. E. 604. To the same effect, see Ensign v. Barse, 107 N. Y. 329, 14 N. E. 400, and 15 N. E. 401, in which case the provisions of a similar curative statute (chapter 287, Laws 1882) were considered. In People v. Turner, 145 N. Y. 451, 40 N. E. 400, the defects complained of were held to be mere irregularities in the proceedings for the collection of the taxes. Page 457, 145 N. Y., and page 401, 40 N. E. And it is evident that Gray, J., who delivered the opinion of the court, did not intend to overrule the doctrine stated in Joslyn v. Rockwell and Ensign v. Barse, supra, as to the effect of the curative acts considered in those cases. In People v. Turner, 117 N. Y. 227, 22 N. E. 1022; Id., 145 N. Y. 451, 40 N. E. 400,—the act of 1885 was termed a "statute of limitations." It was not held, however, applicable to jurisdictional defects in tax sales. Nor was the doctrine stated by Finch, J., in Ensign v. Barse, supra, in reference to the

curative act of 1882, "that the act of 1882 does not, on its face, pur-
port to cure jurisdictional defects. It raised a conclusive presump-
tion of regularity, but leaves the question of the assessor's jurisdic-
tion and authority unaffected,"—questioned. The word "jurisdiction"
has been used in various senses in the authorities. This is adverted
to in the opinion of Gray, J., in People v. Turner, 145 N. Y. 457, 40
N. E. 400. In Ensign v. Barse, supra, on the motion for a reargu-
ment, Finch, J., referring to the opinion delivered in that case, said:

"In the opinion then delivered the defect was not deemed jurisdictional in
any other sense than the modified one of an essential condition under the law
as it stood. Whether it was so jurisdictional as that the legislature could not
have dispensed with it, and therefore could not cure its omission, is a very
different inquiry. A defect may be, in one sense, jurisdictional, relatively to
the authority of the assessors acting under an existing law, and yet not so
as it respects the power of the legislature to pass a statute curing the defect."

In that case it was determined:

"That a retrospective statute curing defects in a legal proceeding, where they
are, in their nature, irregularities only, and do not extend to matters of juris-
diction, is not void on constitutional grounds; that if the thing wanting or
omitted, which constitutes the defect, is something, the necessity for which the
legislature might have dispensed with by prior statutes, or if something had
been done, or done in a particular way, which the legislature might have made
immaterial, the omission or irregular act may be cured by a subsequent stat-
ute."

Giving the word "jurisdiction" the same meaning as is given to
it by Finch, J., in his opinion in the case last cited, and bearing in
mind that, if the unauthorized act of the comptroller under the law
existing in 1843 was one that the legislature could have previously
authorized, such illegal procedure was cured by the acts of 1885 and
1893, can the tax sale in question be sustained? We have to con-
sider the situation as it existed in 1843. The comptroller had a right
to sell the N. E. ¼ for the taxes of 1838 and 1839, but not for those
of 1836 and 1837, which had been paid on said premises, but re-
mained unpaid on other portions of the township, and, under the law,
were a lien on the balance of the township only. Such being the
situation in 1843, could the legislature, previous to the sale, have au-
thorized the comptroller to sell the plaintiffs' land for taxes they
did not owe,—for the taxes charged against the land of another party?
It does not require any argument or citation of authority to show
that the legislature had no such power. The owner of the N. E. ¼ had
paid his taxes for 1836 and 1837, under the provisions of the existing
law. The legislature could not have authorized the comptroller to
sell the lands of such owner for another man's taxes. Had it at-
tempted to authorize such a procedure, its action would have been a
violation of the constitutional rights secured to the owner of the land.
It follows, under the doctrines established in the authorities above
referred to, that the unauthorized act of the comptroller was not
cured by the acts of 1885 or 1893. The attempt by that officer to sell
the N. E.¼ of township 38 for the taxes assessed against other premises
for the years 1836 and 1837 was not authorized by law, and was an
act that the legislature had no power to authorize. The sale made by
the comptroller was not an irregular exercise of power. It was an

act beyond his power.    The fact that he was authorized to sell for the
taxes of 1838 and 1839 does not validate the sale.    He had power
to sell the N. E. ¼ for the taxes of those years, but not for the taxes
of 1836 and 1837.    In selling for the four years under one sale, he
exceeded his powers, and the sale was void.    In People v. Hagadorn,
104 N. Y. 516–524, 10 N. E. 891, it is said:

"The necessary effect of such a joinder of taxes is therefore to make the
payment of an illegal tax the condition of the owner's right to retain his
property, and subject him, contrary to the meaning and spirit of the statute,
to the payment of an unjust and illegal exaction, as the price of his legal right
to redeem his property.  *  *  *  It has been repeatedly held that a sale
of land for the taxes of several years, one of which is void, is an excess of
jurisdiction of the officer making the sale, and renders his proceedings void."

And see Shattuck v. Bascom, 105 N. Y. 39–46, 12 N. E. 283;
Silsbee v. Stockle, 44 Mich. 561–567, 7 N. W. 160, 367, per Cooley,
J.; Stebbins v. Kay, 123 N. Y. 31–34, 25 N. E. 207; Poth v. Mayor,
etc., 151 N. Y. 16–19, 45 N. E. 372.

In the cases last cited, the provisions of the curative acts of 1885
and 1893 were not considered or applicable; but these authorities
establish the doctrine that an unauthorized sale for taxes, a part of
which are legal and a portion illegal, is wholly void.    With some
regret, therefore, in view of the circumstances under which the plain-
tiffs acquired title to the land in question, and the great lapse of time
that has elapsed since the defendant and his grantors have held the
title to the same under the tax sale of 1843, I reach the conclusion
that the said title is invalid.

Several other questions are raised by the appellant which I can
only briefly consider.    The defendant claims that the plaintiffs' title
was extinguished by the tax sale of 1890, at which the N. E. ¼ of town-
ship 38 was sold to one Crandall, and by him the certificate of sale
was assigned to Webb, the defendant's grantor; that a redemption
was afterwards made by one Richard Morrison, who was not shown
to be in any way connected with the title, and, not being in possession,
the comptroller was without jurisdiction to permit a redemption.    A
sufficient answer to this position is that there was testimony given
upon the trial sufficient to justify a finding by the court below that
the redemption was in fact made by plaintiffs' grantor, Richard Pat-
tison, on December 13, 1893, he at that time having title to the
premises; that the entry by the comptroller of the name of the per-
son who made the redemption as Richard Morrison was a mistake.

It is also urged by the appellant that the land in question was
twice patented, and, the defendant's patent being first recorded, the
second patent prevails under the recording act.    When the patent
to Macomb was issued, there was no statute requiring it to be rec-
orded in the office of the clerk of the county where the land was
located.    It was properly recorded in the office of the secretary of
state, under the laws then existing.    Laws 1788, c. 44; Laws 1710,
c. 216.    We are of opinion that the subsequent statute (chapter 110,
Laws 1845), which provided that letters patent, in addition to the
record thereof made in the office of the secretary of state, may be
recorded in the county where the lands granted are situated, in the

same manner and with the like effect as any deed regularly acknowledged or proved, did not compel the record in such clerk's office of a patent previously issued, and properly recorded, under the laws existing previous to the act of 1845. See Varick v. Briggs, 22 Wend. 543.

The patent to Alexander Macomb, under which plaintiffs claimed title, contained the following condition:

"That within the term of seven years, to be computed from the first day of January next ensuing the date hereof, there shall be one actual settlement made on the said tract of land hereby granted for every 640 acres thereof; otherwise these, our letters patent, and the estate hereby granted, shall cease, determine, and become void."

The appellant contends that the appellees' title became forfeited by reason of the failure of their grantors to settle the land, and the subsequent action of the state in granting a second patent. But it has been determined that such a condition in a patent as that above set forth can only be taken advantage of by the state. Williams v. Sheldon, 10 Wend. 654–658; Thompson v. Burhans, 61 N. Y. 52–62. By reason of the breach of the condition above set out, the state undoubtedly could have claimed a forfeiture of the lands in question; but, as stated in the case last cited:

"It does not appear to have done so, but appears to have treated the patent as in force; and hence, for the purpose of this action, the title may be treated as having passed and remained out of the state."

The defendant also asserts that the deeds under which the plaintiffs claim, executed in 1892 and 1893, are void for champerty. The provision of the statute is that:

"Every grant of land shall be absolutely void, if at the time of the delivery thereof, such land shall be in the actual possession of the person claiming under a title adverse to that of the grantor." 2 Rev. St. (Banks & Bros.' 9th Ed.) p. 1813, § 147.

It has been held that this act should be strictly construed. Crary v. Goodman, 22 N. Y. 170. To avoid a deed for champerty, actual, and not constructive, adverse possession in another is required. Dawley v. Brown, 79 N. Y. 390. Without attempting to discuss the evidence, I am of opinion that the defendant failed to show that in 1892 and 1893, when the deeds under which the plaintiffs claim were executed, the lands in question were in the actual possession of defendant's grantor, within the meaning of the champerty act. Said premises at the time were wild forest land. No one resided upon it, and there was no house upon it, except a hunter's camp. It was uncultivated and unimproved. It was not inclosed by any fence. It could not be deemed in the actual possession of Webb, within the meaning of the authorities. See People v. Campbell, 143 N. Y. 335, 38 N. E. 300; Mission v. Cronin, 143 N. Y. 524, 38 N. E. 964. I reach the conclusion, therefore, that the judgment should be affirmed, with costs.